**LAW OFFICES OF TELA L. TROGE, PLLC.**
Tela L. Troge
26 Hill Street # 124
Southampton, NY 11968
Telephone: (631) 745-6203
Email: telatroge@shinnecock.org

**DRAGONFLY LAW GROUP, P.C.**
Judith A. Shapiro
Thomas J. Nitschke
731 St. Joseph St., Suite 230
Rapid City, SD
Telephone: (202) 257-6436
Email: jshapiro@dflylaw.com
        tomn@dflylaw.com

**BYRNES, O'HERN & HEUGLE, LLC**
John F. Byrnes, Esq.
195 East Bergen Place
Red Bank, New Jersey 07701
Telephone: (732) 219-7711
Email: jbyrnes@byrnesohern.com

*Attorneys for Plaintiff Shinnecock Indian Nation*

## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| SHINNECOCK INDIAN NATION, a federally recognized Indian Tribe,<br><br>        Plaintiff,<br><br>v.<br><br>KATHLEEN C. HOCHUL, in her official capacity as Governor of New York;<br><br>LETITIA A. JAMES, in her official capacity as New York State Attorney General;<br><br>MARIE THERESE DOMINGUEZ, in her official capacity as Commissioner of the New York State Department of Transportation;<br><br>THE HONORABLE MAUREEN T. LICCIONE, in her official capacity as | Civil Action No. 2:25-cv-7034<br><br><br><br>**FIRST AMENDED COMPLAINT** |

| Justice of the Supreme Court of the State of New York, Suffolk County, | |
| Defendants. | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff Shinnecock Indian Nation (the "Nation") against the above-named Defendants states and alleges as follows:

## NATURE OF THE ACTION

1.      This is an action to enjoin New York State officials from continuing violations of federal law protecting the Nation's parcel of restricted fee lands commonly referred to as Westwoods and to bring into compliance with federal law the ongoing public use of an illegal 1959 easement on which a portion of Sunrise Highway, also known as New York State Route 27, in the Town of Southampton, New York runs over and across the Nation's Westwoods property. For this Complaint, "Westwoods" property refers to that tract recorded in the Department of the Interior's Trust Asset and Account Management System on January 7, 2025 as provided by 25 C.F.R. Part 150. A true and correct copy of a Title Status Report issued by the Bureau of Indian Affairs is attached as Exhibit A.

2.      The official-capacity Defendants are named pursuant to *Ex parte Young*, 209 U.S. 123 (1908) and its progeny, which allow declaratory and injunctive relief against state officers in their official capacities to stop ongoing violations of federal law, notwithstanding the immunity afforded to States under the Eleventh Amendment of the United States Constitution, as a State does not have, and therefore cannot confer on its individual officials, any authority to violate federal law. *See Seneca Nation v. Hochul*, 58 F.4th 664, 671-74 (2d Cir.

2023) (holding that Indian nation's lawsuit seeking prospective declaratory and injunctive relief against New York State officials for the ongoing use of an invalid easement over tribal lands falls within the *Ex parte Young* exception to the State of New York's Eleventh Amendment sovereign immunity).

3.     The continued operation of Sunrise Highway by Defendants Hochul and Dominguez through the Nation's federally-protected restricted fee lands at Westwoods without a valid right-of-way/easement approved by appropriate federal officials violates federal law protecting the Nation's restricted fee lands against alienation. *See* 25 U.S.C. § 177 (current codification of the Non-Intercourse Act) (originally enacted in 1790) and 25 U.S.C. § 323, 25 C.F.R. Part 169 requiring federal approval of rights-of-way over tribal lands.

4.     In January 2025, the U.S. Department of the Interior ("DOI") affirmed that the Nation's Westwoods property "is and has always been restricted fee land held by the Nation," Westwoods "is within the purview of the Nonintercourse Act," and directed the Bureau of Indian Affairs ("BIA") to record Westwoods to reflect such restricted fee status in a federal land database. Letter from Bryan Newland, Assistant Secretary – Indian Affairs, Dep't of Interior to Lisa Goree, Chairwoman, Shinnecock Indian Nation (Jan. 2, 2025). A true and correct copy of the Letter from Bryan Newland to Lisa Goree is attached as Exhibit B.

5.     As set forth below, in 1959, when New York State claimed a "permanent easement" across the Nation's Westwoods land, it could not do so, under federal law, without approval of the Secretary of the Interior. Federal law forbids alienation of any interest in protected tribal lands. *See* 25 U.S.C. § 177. Similarly, the United States comprehensively regulates rights-of-way across Indian lands such as the Nation's restricted fee lands at

Westwoods, and the operation of Sunrise Highway over and across Westwoods by Defendants Hochul, James, and Dominguez is an ongoing violation of federal law. *E.g.*, 25 U.S.C. § 177; 25 U.S.C. § 323; 25 C.F.R. Part 169. The New York State government officials who claimed the purported 1959 easement for Sunrise Highway across the Nation's Westwoods land did not comply with federal law, and that easement was void ab initio.

6. The Nation therefore brings this action seeking declaratory and injunctive relief to require that the Defendants (except for Defendant Justice Liccione) obtain a valid right-of-way for the portion of the Nation's Westwoods property on which Sunrise Highway is situated, so as to bring continued public use of, and benefit from, those Indian lands into compliance with federal law on terms that will equitably compensate the Nation pro rata for future use of its lands.

7. The Nation also seeks to enjoin state-court proceedings in the Supreme Court of the State of New York, Suffolk County brought by New York State and Defendant Dominguez over which Defendant Justice Liccione presides. In that action, New York State Department of Transportation and Defendant Dominguez seek to enjoin the operation of advertising display signs on each side of Sunrise Highway at the Nation's Westwoods property within the purported 1959 easement. They also seek the removal of the Monument Signs despite their placement on the Nation's restricted fee land in Westwoods. Defendant Justice Liccione has ordered that the Nation immediately cease operation of the Monument Signs and has indicated that she is "looking into" paths to punish the Nation's Trustees, officials of the governing body of the Nation. Under well-established federal Indian law principles, the preliminary injunction interfering with the Nation's federally-protected sovereignty over

4

Westwoods must be enjoined, and the state-court proceedings in which it was issued must be halted.

**PARTIES**

8.    Plaintiff Shinnecock Indian Nation is a federally recognized Indian Nation. *See* Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs, 89 Fed. Reg. 99,899, 99,901 (Dec. 11, 2024).

9.    The Nation is also recognized as an Indian Tribe by the State of New York under New York state law. N.Y. Indian Law § 2.

10.    Defendant Kathleen C. Hochul is the Governor of the State of New York and is sued here only in her official capacity.

11.    Defendant Letitia A. James is the Attorney General of the State of New York and is sued here only in her official capacity.

12.    Defendant Marie Therese Dominguez is the Commissioner of the New York State Department of Transportation and is sued here only in her official capacity.

13.    Defendant The Honorable Maureen T. Liccione is a Justice of the Supreme Court of the State of New York, Suffolk County. Justice Liccione is currently presiding over *Commissioner of the New York State Department of Transportation et al. v. Lisa Goree et al.*, Index No. 610010/2019, a case pending in the Supreme Court of the State of New York, Suffolk County. Justice Liccione is sued here only in her official capacity. The Nation names Justice Liccione in the same manner that the plaintiff in *Bowen v. Doyle* named the state court judges presiding over contempt proceedings where the United States District Court for the Western District of New York granted summary judgment in favor of plaintiff and enjoined defendants from

exercising jurisdiction over a controversy concerning tribal governance. 880 F. Supp. 99, 112 (W.D.N.Y. 1995), *aff'd*, 230 F.3d 525 (2d Cir. 2000).

<u>**JURISDICTION AND VENUE**</u>

14.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 (because the Nation's claims arise under federal law); 28 U.S.C. § 1362 (because this case is brought by an Indian nation and arises under federal law); and 28 U.S.C. §§ 2201–2202 (because the Nation is seeking relief under the Declaratory Judgment Act).

15.     The Court has federal question jurisdiction because the Complaint alleges ongoing violations of the Nation's rights and the legal status of Westwoods pursuant to federal law, including but not limited to 25 U.S.C. § 177 and 25 U.S.C. § 323.

16.     This Court has jurisdiction to grant prospective injunctive and declaratory relief against the named New York State officials under *Ex parte Young*, 209 U.S. 123 (1908), and the Court's inherent equitable powers.

17.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because it is a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated.

<u>**FACTUAL BACKGROUND AND ALLEGATIONS**</u>

**A.  Shinnecock Indian Nation History**

18.     From time immemorial, the Shinnecock Indian Nation and its citizens have resided on their ancestral homelands on what is now the eastern end of Long Island, New York. In 1640, the first English colonists arrived on the East end of Long Island. On December 13, 1640, English colonists negotiated with the Shinnecock for the purchase of

eight square miles of Indian lands to establish the Village of Southampton. For centuries thereafter, the Nation lost control of the vast majority of its original homelands, almost entirely through fraudulent transactions.

19.     During the colonial period, the Shinnecock Tribal land transactions—and official limits on alienation—were imposed by the crown with oversight through crown officials within the Colony of Connecticut, and later, by the Colony of New York.

20.     Upon adoption, the United States Constitution deprived states of Indian Affairs powers, centralizing those powers in the federal government through the Indian Commerce Clause, Article I, Section 8, Clause 3. *See Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 60-62 (1996) (discussing the federal government's exclusive power over Indian affairs).

21.     The State of New York State has continuously maintained a formal relationship with the Shinnecock Tribe. In 1792, the State displaced traditional governmental structure and instead imposed a new three trustee leadership structure on the Tribe to make all decisions about land use, the new structure displaced traditional systems that protected the Tribe's land. An Act for the benefit of the Shinnecock Tribe of Indians (Feb. 24, 1792). With that reorganization, the State oversaw, for centuries, annual elections that seated the three trustees. Elections were held at the Southampton Town Hall under the supervision of the Town Clerk, who maintained records of such elections. A true and correct copy of An Act for the benefit of the Shinnecock Tribe of Indians (Feb. 24, 1792) is attached as Exhibit C.

22.     New York State adopted a range of "Indian Laws"—Chapter 26 of the N.Y. Indian Law that governed its interaction with Indian Tribes, generally, and special provisions for Shinnecock, specifically, Article 9 of Chapter 26 of the N.Y. Indian Law.

23.     The Federal Government exercised minimal authority over Indian Tribes located within New York State until the mid-20th Century. Before that time, the New York State Indian Commission assessed the respective jurisdiction and tribal sovereignty issues within New York State. When the Chairman of that Commission, Edward A. Everett, determined that Indian Tribes had retained ownership and sovereignty over significant tracts of land, the New York State Legislature declined to adopt the Commission's report. *See* N.Y. State Indian Comm'n, Report of N.Y. State Indian Commission to Investigate the Status of the American Indian Residing in the State of New York (Mar. 17, 1922) ("The Everett Report").

24.     By 1941, when Felix Cohen published the Handbook of Federal Indian Law as a project of the United States Department of the Interior, the Chapter entitled "New York Indians" which discussed Indian Tribes within New York State, including the Shinnecock Tribe on Long Island. The 1941 Cohen's Handbook states that the Shinnecock trustees "have authority over tribal land and timber matters" on the Tribe's lands.

25.     Under Federal law, and particularly the Indian Commerce Clause, federal power excludes State power over Indian Tribes, unless such power is expressly delegated by Congress. Through 25 U.S.C. §§ 232 and 233, Congress granted New York State the State's limited civil adjudicatory jurisdiction and criminal jurisdiction and limited on tribal lands. The State thus responds when the Nation requests criminal enforcement and has, increasingly asserted civil jurisdiction, to an extent contested in this action.

26.     In 1976, the U.S. Supreme Court determined that Pub L. 280, a later enacted federal statute using similar language to extend criminal and civil jurisdiction over Indian lands

to specific states, must be read to limit such civil authority to civil adjudicatory and not regulatory jurisdiction. *Bryan v. Itasca Cty.*, 426 U.S. 373, 390 (1976).

27.    On December 31, 1987, the Attorney General of the State of New York, issued a formal opinion that 25 U.S.C. § 233 was similarly limited, and that New York State civil jurisdiction over Indian Lands did not extend to regulatory power. 1987 N.Y. Op. Atty. Gen. 35 (N.Y.A.G) (explaining that "Congress has not thereby granted states … civil regulatory authority over Indians on reservations" and U.S.C. § 232 and U.S.C. § 233 "appear not to provide the State with authority to regulate substance abuse programs on Indian reservations").

## B.  The Nation's Tribal Status

28.    On February 8, 1978, the Shinnecock asked the federal government for litigation assistance with a land claim for other tracts of land not subject to this lawsuit. Rather than agreeing, the United States denied assistance to the Shinnecock Tribe and construed the litigation request as a petition to commence the new federal acknowledgment process. That process, set forth at 25 C.F.R. Part 83 (since revised) was established in 1978 as formal path to "acknowledge" the existence of Indian Tribes for the purpose of confirming a government-to-government relationship with those tribes. At the far end of that process, the Shinnecock could call upon the United States for assistance in enforcing the Non-Intercourse Act.

29.    The Shinnecock succeeded in achieving full federal acknowledgment in 2010, fully 32 years after entering the process. Having changed its name to the Shinnecock Indian Nation, the Nation became the 565th federally recognized Indian Tribe on the list maintained by the DOI, which requires that the DOI accord all sovereign rights and entitlements equally

to all tribes on that list, without respect to historical differences. A true and correct copy of the notice of federal acknowledgment is attached as Exhibit D.

30. The Nation continues to remain on DOI's list of federally recognized Indian Tribes.

## C. The Nation's Westwoods Property

31. The Nation's primary recorded landholdings consist of: (1) the Shinnecock Neck, a peninsula that juts into the Shinnecock Bay on the South Fork of Long Island, and (2) Westwoods—the parcel of Nation's land that is the subject of this action—located in Hampton Bays within the Town of Southampton bordered on the north by the Great Peconic Bay.

32. Suffolk County tax maps consistently recognize Westwoods as Indian land. All five subdivision maps filed with the Suffolk County Clerk between 1929 and 1993 refer to Westwoods as "Indian lands," "Shinnecock Reservation," or "Shinnecock Tribe." The first such subdivision map was filed on October 11, 1929. That map is known as Hampton Pine Beach Inc. and is identified as Filed Map #163. The subdivision map includes a survey which labels the Shinnecock Land as "Indian Land." True and correct copies of Suffolk County tax maps are attached as Exhibit E. True and correct copies of Hampton Pine Beach Subdivision Map and Survey is attached as Exhibit F.

33. The next subdivision map filed adjacent to the Shinnecock Land was filed as Map #4205, Holzman Estates. That map includes a survey which describes the Shinnecock Land as "Reputed to be Indian Lands." A true and correct copy of the Holzman Estates Subdivision Map is attached as Exhibit G.

34.     The next filed map was Squire Woods, Filed Map #6450, filed on September 24, 1976. That map's surveys the Shinnecock Land as "Shinnecock Tribe." A true and correct copy of the Squire Woods Subdivision Map is attached as Exhibit H.

35.     Six years later, Filed Map #7079 was filed. That map, known as Ravenswood surveyed the Shinnecock land as "Indian Land." A true and correct copy of the Ravenswood Subdivision Map is attached as Exhibit I.

36.     The final subdivision map was Filed Map 9340, filed on April 7, 1993 and known as Newtown Estates. That map surveys the Shinnecock Land as "Shinnecock Indian Reservation." A true and correct copy of the Newtown Estates Subdivision Map is attached as Exhibit J.

37.     An abstract of title was filed with each map, and the land description of all five maps describe being bound by Indian Land, Reputed to be Indian Land, Shinnecock Tribe, or Shinnecock Indian Reservation. True and correct copies of the Abstract of Title for Each Subdivision Map are attached as Exhibit K.

38.     The Tax Records of Suffolk County are consistent with the ownership status of the Nation, as noted above, indicating that Westwoods has never been taxed. True and correct copies of the Suffolk County tax records are attached as Exhibit L.

39.     The Suffolk County Real Property Tax Agency describes the Shinnecock Land in the vicinity of the easement as (3) parcels described as a 2 acre parcel identified as Suffolk County Tax Map District No. 900, Section 207, Block No. 1, Lot No.1, a 36.54 acre parcel identified as Suffolk County Tax Map District No. 900, Section 187, Block No. 2, Lot No. 78 and a 41 acre parcel identified as Suffolk County Tax Map District No. 900, Section 186,

Block No. 2, Lot No. 38. *See* Exhibit E (Suffolk County tax maps) and Exhibit L (Suffolk County tax records).

40. All three tax maps designate their respective lots as "Shinnecock Indian Reservation" on the face of the map. *See* Exhibit E (Suffolk County tax maps).

41. New York Consolidated Laws, Indian Law - IND § 6 provides that "[n]o taxes shall be assessed, for any purpose whatever, upon any Indian reservation in this state, so long as the land of such reservation shall remain the property of the nation, tribe or band occupying the same."

42. The 2019 Tax Records for 900, Section 207, Block No. 1, Lot No.1 and Map District No. 900, Section 187, Block No. 2, Lot No. 78 identify the Parcel as: "Indian Reservation, Hampton Bays. Shinnecock Indian Reservation. PO Box 5006 Southampton, NY 11969. *See* Exhibit L (Suffolk County tax records).

43. The Suffolk County Comptroller is the holder of records for the Town of Southampton. Neither the Town of Southampton nor the Suffolk County Comptroller keep tax records prior to 1929.

44. There is no record of any property taxes assessed or imposed on the Nation's Westwoods property.

45. There is no record of any challenge to the public records identifying Westwoods as "Indian Land" or the "Shinnecock Indian Reservation."

46. In January 2025, the DOI notified the Nation that the Nation's Westwoods property "is and has always been restricted fee land held by the Nation," Westwoods "is within

the purview of the Nonintercourse Act," and directed the BIA to record Westwoods to reflect such restricted fee status in a federal land database.

**D. Sunrise Highway and Purported 1959 Easement**

47. Sunrise Highway, also known as New York State Route 27, is a highway under the supervision and control of the State of New York spanning approximately 120.58 miles from Interstate 278 in the New York City borough of Brooklyn to Montauk Point State Park on Long Island, New York.

48. Sunrise Highway traverses over and across a portion of the Nation's Westwoods property in the Town of Southampton, New York. The roadway has two lanes in each direction, with a wide median, and buffer on each side. Sunrise Highway bisects the Nation's Westwoods property and renders the southern portion substantially inaccessible.

49. On July 22, 1959, New York State Department of Public Works—the New York State Department of Transportation's predecessor—purported to acquire a permanent easement from the Nation for highway purposes over Westwoods. A true and correct copy of the purported 1959 easement is attached as Exhibit M.

50. On July 22, 1959, the Director of the Bureau of Rights of Way and Claims filed with the Suffolk County Clerk a Notice of Appropriation to the Tribe of Shinnecock Indians at Indian Reservation, Peconic Bay, Southampton, N.Y. on behalf Superintendent of Public Works of the State of New York. A true and correct copy of the Notice of Appropriation is attached as Exhibit N.

51. The purported easement identifies the "Shinnecock Tribe" as the "reputed owner" of certain "Indian Lands."

52. The purported easement states that it is a "permanent easement" over 3.62 acres of the Nation's Westwoods property "for the purpose of constructing, reconstructing and maintaining thereon a highway and highway structure."

53. The purported easement was not signed by a representative of the United States and contains no reference to the United States.

54. The Notice of Appropriation describes a project known as Sunrise Highway Extension S.H. No. _____ [sic] County of Suffolk, Southampton Town. The description and maps are identified as Map. No. 2050 Parcel 50.

55. Map 2050 Parcel 50 was filed in the Suffolk County Clerk's office on July 22, 1959 and was prepared at the direction of the New York State Department of Public Works.

56. A year later, an affidavit reported that personal service was made to "Charles Smith, Trustee of the Tribe of Shinnecock Indians" at 400 Park Ave. Babylon, N.Y. on August 18, 1960 and was recorded in the records of the Suffolk County Clerk on August 26, 1960.

57. At the time, the Shinnecock Tribe government included three Trustees, one of whom was named Charles K. Smith.

58. The Tribe's headquarters is located on Shinnecock Neck has been located there continuously since 1859.

59. The Tribe had no official relationship with any person located at 400 Park Ave. Babylon, N.Y.

60. The Nation's tribal government was not consulted in advance of the State's claimed easement.

61. The Nation has no record of receiving notice of the purported easement.

62.     The Nation received no compensation for the taking of the purported easement.

63.     The United States was not consulted prior to the taking of the purported easement, and there is no record that the United States approved the purported easement.

64.     As evidenced on the face of the document, New York State knew that Westwoods was Indian land, limiting its taking to an easement, rather than claiming fee title through eminent domain as it did for all the remainder of the Sunrise Highway route.

65.     The Map includes a survey and description of the land labeling the land Indian Lands Shinnecock Tribe (Reputed Owner). The appropriation was limited to a permanent easement for highway purposes.

66.     The purported easement also violated New York law, New York Consolidated Laws, Indian Law - IND § 7-a. Purchase of lands of Indians "[n]o purchase or contract for the sale of lands of Indians in this state, shall be valid unless made under the authority, and with the consent of the legislature."

67.     The New York Legislature did not authorize the sale of the Westwoods property.

68.     State law protected Shinnecock lands against alienation along with lands of all other New York State Tribes, in a form strikingly similar to the federal protections that definitively undermine the validity of the 1959 easement.

69.     The Sunrise Highway Extension Project extended to the west and east of Map 2050 Parcel 50. Map 2040 Parcel 49 is directly adjacent to Map 2050 on the west. The reputed owner of that property was Charles J. Hardy, a non-Indian who took title to the land under

Tax Deed recorded in Liber 942 Page 365. A true and correct copy of Map 2047 Parcel 47 is attached as Exhibit O.

70.     That map was a "map and description of property which the Superintendent of Public Works deems necessary to be acquired in fee, in the name of the People of the State of New York, without the right of access to and from abutting property, by appropriation, for purposes connected with the Highway System of the State of New York, pursuant to Section 30 of the Highway Law."

71.     Similarly, on the east of Map 2050 Parcel 50 is Map 2053 Parcel 53. The reputed owner of that property was Leroye E. Bell and Helen Bell, non-Indians who took title the Land under a Bargain and Sale deed recorded in Liber 4047 Page 400. A true and correct copy of Map 2053 Parcel 53 is attached as Exhibit P.

72.     That map was also a "map and description of property which the Superintendent of Public Works deems necessary to be acquired in fee, in the name of the People of the State of New York, without the right of access to and from abutting property, by appropriation, for purposes connected with the Highway System of the State of New York, pursuant to Section 30 of the Highway Law."

73.     In sum, all other land besides the Indian Land in Map 2050 Parcel 50 needed for the construction of the Sunrise Highway Extension Project was acquired in fee by appropriation under Section 30 of the Highway Law.

74.     In 1973, the New York State Legislature enacted chapter 31 of the New York State Highway Law, including a provision requiring federal approval for land transactions between the State and the Indians. Then Attorney General Louis J. Lefkowitz opposed the

legislation, arguing that to require federal approval of pending land sales was a tacit admission that New York's prior exercises of eminent domain without federal approval were unlawful. Laurence M. Hauptman, Formulating Indian Policy in New York State, 1970-1986, 97, 103 (1998).

### E. Economic Challenges Facing the Shinnecock Indian Nation

75.     The Nation provides essential governmental services to its citizens, the majority of whom live below the federal poverty line.

76.     Unlike state and local governments, the Nation must rely on inadequate federal programs, including grants and loans, and must supplement its funding with economic development projects.

77.     In recent years, the Nation has pursued economic development projects on its Westwoods property. Its efforts mirror those undertaken nationally by tribes seeking to fund important governmental services for their citizens.

### F. Monument Sign Development

78.     With limited opportunities for governmental economic development, the Nation became determined to undertake a project to construct advertising display signs ("Monument Signs") on each side of the Sunrise Highway.

79.     On February 5, 2019, the Nation and Iconic Digital Displays, LLC ("Iconic") executed a Construction and Management Agreement ("the Agreement"), with Iconic Digital Displays, LLC, under which Iconic would "construct two (2) Structures and manage the operation of four (4) digital advertising Displays, illuminated on those Structures, located on Plots of land on each side of Sunrise Highway."

80.     Previous efforts to develop Westwoods, before the Nation achieved federal acknowledgment, had been blocked by litigation.

81.     The Displays represented a less intense use of the Westwoods property than previous attempts, requiring no new roads, no increased traffic, and virtually no impact on neighboring properties.

### G. Nation's voluntary accommodation of State safety concerns

82.     While the Nation does not recognize or acknowledge any legal obligation to abide by the laws or regulations of the New York State when it comes to the use of the Westwoods property and the erection of the Monument Signs, in an act of good faith, the Nation allowed its business partner to enter into discussions with representatives of the Department of Transportation ("NYSDOT") in an effort to accommodate their concerns.

83.     During those discussions, the Business partner shared planning documents with representatives of the NYSDOT and the Nation agreed to adopt some measures to accommodate NYSDOT's expressed concerns with public safety, including design specification, distance from Roadway, and placement of warning barrels.

84.     The Nation did not agree with NYSDOT's assertion of authority to require State permits for the construction of the Monument Signs and instead issued its own permit including the safety accommodations it had made in response to the NYSDOT's request.

85.     The Nation offered NYSDOT an opportunity to inspect the Monument Sign.

86.     NYSDOT has never accepted that inspection opportunity.

87.     There have been no safety issues associated with the Monument Signs in over five years of operation.

88. Over the past several years, the State has operated surveillance cameras within the claimed easement, which monitor the Nation's activities on Westwoods, beyond the limits of the claimed 1959 easement.

89. The Monument Signs project provide vital support for the Nation. For many years now, and still, the majority of the Nation's members have lived below the federal poverty line. The revenue the Nations receives from the Monument Signs has allowed it to provide essential services to its members, including minors and senior citizens.

90. The Nation currently receives a critical source of revenue from the operation of the Monument Signs, and the revenue has been and continues to be utilized in all aspects of the Nation's tribal government.

91. The Nation's governmental services and programs rely in large part on the revenue from the continued operation of the Monuments Signs.

## H. The U.S. Department of the Interior's Recording of Westwoods as Federally-Protected Restricted Fee Lands

92. The Nation holds title to Westwoods in restricted fee—as reflected in federal land records.

93. On January 2, 2025, after a three-year examination of local land records, Bryan Newland, Assistant Secretary – Indian Affairs at DOI signed a letter addressed to the Shinnecock Indian Nation stating that:

> The Department examined the land title status of the Westwoods parcel and determined that it is within the Nation's aboriginal territory, that the Nation has resided within its aboriginal territory since time immemorial and has never removed therefrom, and that Westwoods is within the purview of the Nonintercourse Act and is therefore restricted against alienation absent consent of the United States. *This land is and has always been restricted fee land held by the Nation and is now recorded to reflect such status.*

(emphasis added).

94.    On January 7, 2025, Jamie Allen, Manager of the Branch of Land Title and Records of the BIA, signed a Title Status Report demonstrating that Westwoods, as identified in the DOI land description has been recorded in the official rolls of the BIA as "Restricted Fee" land.

95.    The Title Status Report confirms the status of Westwoods as restricted fee land as reflected on BIA's Trust Asset Accounting Management System ("TAAMS"), which is the system of record for trust land management for the U.S. Department of the Interior.

96.    The Title Status Report demonstrates that Westwoods has been recorded as "Restricted Fee" in the federal land records:

**Title Status**

Tract 049 T 100 [Westwoods] is held by the United States of America in trust for the land owner(s) with trust interests and/or by the land owner(s) with restricted interests and/or fee simple interests, as listed in Appendix "B" attached to and incorporated in this Title Status Report.

The title of Tract 049 T 100 is current, complete, correct, and without defect. Ownership is in unity and interests are owned in the following title status: restricted.

The tract ownership is encumbered by the title documents which have been approved by a properly delegated Federal official and are required to be recorded by law, regulation, or Bureau policy as listed on Appendix "C" attached to and incorporated in this Title Status Report.

97.    Appendix B of the Title Status Report lists one hundred percent of the Westwoods, property Tract 049 T 100, as "Restricted Fee."  Appendix C demonstrates that the United States did not find any title defect or encumbrances to Westwoods.  Appendix E states that the U.S. Department of Interior "Solicitor's Office concluded that [the] Westwoods

20

Territory is within the purview of the Nonintercourse Act and is restricted against alienation absent consent of the United States."

98.     Although the Title Status report records the existence of New York's claimed highway easement, it also notes "no encumbrances found," implying that the DOI solicitors' did not accept the validity of New York's claimed easement.

99.     The recording of Westwoods in the TAAMS database confirms that Westwoods "is and has always been restricted fee land held by the Nation."

**I. Administrative Review of the U.S. Department's Recording of Westwoods as Federally-Protected Restricted Fee Lands**

100.     Following the recording of Westwoods in the TAAMS database, the NYSDOT sought administrative review before the Interior Board of Indian Appeals ("IBIA") of Assistant Secretary Newland's letter directing the BIA to record Westwoods in the TAAMS database as restricted fee land.

101.     At IBIA's request, the NYSDOT submitted briefing to the IBIA regarding whether the IBIA had jurisdiction to review the Department's appeal.

102.     On July 7, 2025, the IBIA determined that it lacked jurisdiction to review the New York State Department of Transportation's appeal.

103.     On August 4, 2025, the Town of Southampton, whose administrative appeal had also been dismissed, commenced a lawsuit under the Administrative Procedure Act against the U.S. Department of the Interior and the Assistant-Secretary of Indian Affairs seeking judicial review of the Department's determination that Westwoods is federally-protected restricted fee lands, and the recording of Westwoods in the BIA's TAAMS database.

104.     Neither New York State, the NYSDOT, or any New York State official has sought judicial review of Assistant Secretary Newland's letter affirming the status of Westwoods as restricted fee land and directing the BIA to record Westwoods in the TAAMS database as restricted fee land.

**J.   State Court Litigation Concerning the Monument Signs**

105.     In *Commissioner of the New York State Department of Transportation et al. v. Lisa Goree et al.*, Index No. 610010/2019, New York State and the NYSDOT Commissioner brought suit against the Nation's business partners and the Nation's Council of Trustees, officials of the governing body of the Nation. In the litigation, New York State and the NYSDOT Commissioner seek to enjoin the construction, operation, and maintenance of the Monument Signs on the Nation's lands at Westwoods within the purported 1959 easement. Ultimately, New York State and the NYSDOT Commissioner also seeks to remove the Monument Signs from the Nation's restricted fee lands in Westwoods.

106.     On May 18, 2020, Justice Sanford Neil Berland of the Supreme Court of the State of New York, Suffolk County issued an order denying a preliminary injunction requested by New York State and the NYSDOT Commissioner seeking to enjoin the Nation's construction and operation of the Monument Signs. In the order, Justice Berland stated "not only is it undisputed that the Nation owns the land in question . . . but there is no doubt that the Nation owned it for many decades, if not centuries, predating most, if not all, significant development in the area and that it is the only remaining part of their once-extensive demesne that touches the Peconic Bay side of Long Island." Noting that the "presence of the Nation in that domain has been continuous, Justice Berland placed the burden on the New York State

to "refute the defendant's contention that the Nation has sovereign control over the Westwoods property." Justice Berland found that "it is impossible to conclude [the State] will succeed in doing so."

107.    On December 4, 2024, the Appellate Division of the Supreme Court of the State of New York issued an opinion and order enjoining the Nation's Council of Trustees and the Nation's business partners from operating the Monument Signs at Westwoods over the land that the purported 1959 easement runs through. *Comm'r of N.Y. State Dep't of Transp. v. Polite*, 225 N.Y.S.3d 106 (N.Y. App. Div. 2024). The court accepted as true the State's allegation that the Nation owns Westwoods "in fee simple, subject to the State's easement, even if the plaintiffs were ultimately to prevail in this action, the Nation would continue to own the subject property in fee simple, subject to the State's easement." *Id.* at 130.

108.    The December 2024 ruling preceded DOI's land status determination by less than a month, determining that the fee simple allegation had been incorrect, because Westwoods had, in fact, been continuously held by the Nation; and that it is and has always been restricted fee land.

109.    Subsequently, the Nation's Council of Trustees submitted to the Supreme Court of the State of New York a renewed motion to dismiss, contending that Assistant Secretary Newland's January 2, 2025 letter confirming Westwoods as restricted fee lands protected under federal law fundamentally removes the basis for the conclusion reached by the Appellate Division of the Supreme Court of the State of New York in its December 4, 2024 opinion and order, and the case should be dismissed for lack of jurisdiction.

110.    On October 14, 2025, Defendant Justice Liccione denied the Council of Trustees' renewed motion to dismiss, determining that Assistant Secretary Newland's January 2, 2025, letter confirming Westwoods as restricted fee lands protected under federal law "is not grounds to renew" because the letter "only provided that Westwoods is restricted against alienation absent consent of the United States." Defendant Justice Liccione ordered that the Nation's Council of Trustees and its business partners "remain enjoined from constructing, operating, and maintaining advertising Billboards located in the State's recorded right-of-way for Route 27, Sunrise Highway, Town of Southampton, Suffolk County."

111.    On November 24, 2025, Defendant Justice Liccione issued an order holding the Nation's Council of Trustees and its business partners in contempt and ordering that they "immediately cease operation of the billboards and advertising displays located within the State of New York['s] right-of-way on New York State Route 27 (Sunrise Highway) in the Town of Southampton, New York."

112.    Defendant Justice Liccione fined the Nation's commercial partners involved in the Monument Signs development and operation, but noted no ability to impose financial penalties on the Nation's Trustees, over whom jurisdictional theory is limited to *Ex parte Young* type injunctive relief.

113.    On December 16, 2025, Defendant Justice Liccione challenging the operation of the sign indicated that she was considering further enforcement against the parties for continued operation of the sign, and was "looking into" paths to punish the Nation's Trustee defendants. Defendant Justice Liccione requested the Assistant Attorney General representing New York State Department of Transportation Commissioner and State of New York in the

state court litigation to provide an update by December 23, 2025 on whether the Monument Signs are still operating.

114.    On December 23, 2025, the Assistant Attorney General representing New York State and the NYSDOT Commissioner in the state court litigation submitted an update with the state court indicating that Monument Signs are still in operation.

### K. Federal Law Restricting the Alienation of Indian Lands and Comprehensively Regulating Rights-of-Way Across Indian Lands

115.    Because the Nation's Westwoods land consists of federally-protected restricted fee lands, it is subject to federal statutes and regulations that govern restricted fee lands.  As relevant here, those laws include the Non-Intercourse Act of 1790, presently codified at 25 U.S.C. § 177 (the "Non-Intercourse Act"), and the Indian Right-of-Way Act of 1948, 25 U.S.C. §§ 323–328 (the "Right-of-Way Act"), which provides that no right of way is valid over Indian lands without approval of the United States. Implementing regulations, codified at 25 C.F.R. Part 169, condition DOI's approval on submission of all relevant documentation to the BIA, which, as fiduciary to the tribal entity, must evaluate the entire transaction to protect the tribe's interest.

116.    The Non-Intercourse Act prohibits the alienation of any interest in Indian lands absent consent of the United States.  The current version of the Non-Intercourse Act, in pertinent part, provides that: "No purchase, grant lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity." 25 U.S.C. § 177.  The Non-Intercourse Act provides that "any easement over Indian land require[s] the consent of the United States." *Seneca Nation v. Hochul*, 58 F.4th 664, 667 (2d Cir. 2023) (citing 25 U.S.C. § 177).

25

117.     As explained by Bryan Newland, Assistant Secretary – Indian Affairs, "Westwoods is within the purview of the Nonintercourse Act and is therefore restricted against alienation absent consent of the United States."  Letter from Bryan Newland, Assistant Secretary – Indian Affairs, Dep't of Interior to Lisa Goree, Chairwoman, Shinnecock Indian Nation (Jan. 2, 2025).

118.     The Right-of-Way Act empowers the Secretary of the Interior "grant rights-of-way for all purposes, subject to such conditions as he may prescribe, over and across … any lands now or hereafter owned, subject to restrictions against alienation, by individual Indians or Indian tribes, communities, bands, or nations … and any other lands heretofore or hereafter acquired or set aside for the use and benefit of the Indians." 25 U.S.C. § 323.

119.     The Right-of-Way Act is intended to "preserv[e] and protect[] … Indian interests." *S. Pac. Transp. Co. v. Watt*, 700 F.2d 550, 554 (9th Cir. 1983).  The Right-of-Way Act became operative on March 6, 1948, 30 days after it was approved on February 5, 1948.  *See* 62 Stat. 18.

120.     The Nation's lands at Westwoods are lands "acquired or set aside for the use and benefit of Indians" within the meaning of 25 U.S.C. § 323.

121.     Under the Right-of-Way Act, "[n]o grant of a right-of-way shall be made without the payment of such compensation as the Secretary of the Interior shall determine to be just."  25 U.S.C. § 325.

122.     Moreover, the federal regulations under the Right-of-Way Act provide: "If an individual or entity takes possession of, or uses, Indian land or BIA land without a right-of-way and a right-of-way is required, the unauthorized possession or use is a trespass" and "[t]he

Indian landowners may pursue any available remedies under applicable law." 25 C.F.R. § 169.413.

123.    The federal regulations under the Right-of-Way Act also provide that "Tribal land" encompasses land "owned by one or more tribes in … restricted status." 25 C.F.R. § 169.2. Restricted status means that "one or more tribes and/or individual Indians holds title to the tract or interest, but can alienate or encumber it only with the approval of the United States because of limitations in the conveyance instrument under Federal law or limitations in Federal law." *Id.*

124.    The regulations also make clear that "[i]f the tribe owns *any interest* in a tract, it is considered 'tribal land' and the tribe's consent for rights-of-way on the tract is required under 25 U.S.C. § 323." 80 Fed. Reg. 72,492, 72,497 (Nov. 19, 2015) (emphasis added).

125.    The federal regularly scheme governing rights-of-way across Indian land is comprehensive and preempts state law. "The Federal statutes and regulations governing rights-of-way on Indian lands occupy and preempt the field of Indian rights-of-way." Rights-of-Way on Indian Land, 80 Fed. Reg. 72,492, 72,505 (Fed. Reg. Nov. 19, 2015). "The Federal regulatory scheme is pervasive and leaves no room for State law." *Id.* "Federal regulations cover all aspects of rights-of-way." *Id.*

## L.  Failure to Obtain a Federal Right-of-Way Over Westwoods

126.    In 1959, under federal law, a valid easement over the Nation's Westwoods property could not be obtained without approval of the Secretary of the Interior pursuant to 25 U.S.C. § 177, 25 U.S.C. § 323, and applicable federal regulations.

127. The purported 1959 easement agreement was not signed by a representative of the United States and contained no reference to the United States or to the requirement for federal approval of the conveyance.

128. New York State government officials have never sought or obtained from the Secretary of the Interior a right-of-way over and across the Nation's Westwoods property for Sunrise Highway, as required by the Non-Intercourse Act and the Right-of-Way Act. Nor has the Secretary of the Interior ever otherwise granted such a right-of-way over Sunrise Highway.

129. Defendants Hochul, James, and Dominguez have authority separately and collectively to seek and obtain a right-of-way for the State of New York and have failed to do so for the portion of the Nation's Westwoods property where Sunrise Highway is located.

130. The executive power of New York State is vested in Governor Hochul, who, by virtue of this executive power, has the constitutional authority to seek a valid right-of-way for the State of New York for that portion of Sunrise Highway that traverses the Nation's Westwoods property.

131. Attorney General James likewise has the authority to seek a valid right-of-way as she is authorized to participate in any "action or proceeding affecting the property or interests of the state," N.Y. Exec. Law § 63, and she has not done so for the portion of Sunrise Highway that traverses the Nation's Westwoods property.

132. Similarly, Commissioner Dominguez has "the power to acquire by grant or purchase" interests in land necessary for the lawful operation of Sunrise Highway, *see* N.Y. Highway Law § 347, and she has not sought a right-of-way for the portion of Sunrise Highway that traverses the Nation's Westwoods property.

133.     As specified by the Assistant Secretary's Notice, the restricted fee status dates back to 1790. Likewise, upon the 2010 DOI determination of the Nation's federal acknowledgment, the Nation was recognized as deserving all rights and protections of the United States retroactive to the beginning of the United States. As such, the approval requirement for a valid easement was fully applicable in 1959.

## CLAIMS FOR RELIEF

### COUNT I:  Federal Law Preemption

134.     The Nation incorporates by reference and re-alleges the allegations contained in paragraphs 1 through 133 of this Complaint.

135.     Defendants Hochul, James, and Dominguez seek to force the Nation on federally-protected restricted fee lands to comply with New York's Highway and Vehicle & Traffic Laws.

136.     Under federal common law and rules governing the construction of Indian statutes, federal law preempts the application of state and local law and regulation to Indian tribes on Indian lands.

137.     States' relationships with federally-recognized Indian tribes are controlled by federal law pursuant to the Indian Commerce Clause of the U.S. Constitution.  U.S. Const. art. I, § 8, cl. 3.

138.     The Indian Commerce Clause is the supreme law of the land controlling New York's jurisdiction and interaction with federally-recognized Indian tribes. U.S. Const. art. VI, cl. 2.

139.     Pervasive federal laws and regulations preempt the application of New York

State Highway Law, Vehicle & Traffic Laws, and other New York state laws on the Nation's Westwoods property.

140.     25 U.S.C. § 233 grants limited civil adjudicatory jurisdiction to New York State but does not confer regulation jurisdiction over Indian lands.

141.     Only Congress, through express and explicit action, can regulate an Indian tribe or otherwise limit their sovereign powers.

142.     No federal statute provides Defendants Hochul, James, and, Dominguez with regulatory jurisdiction to enforce New York Highway and Vehicle & Traffic Laws on federally-protected restricted fee lands.

143.     Defendants Hochul, James, and Dominguez impermissibly seek to assert New York State's regulatory authority over the Nation in a manner forbidden by the U.S. Constitution as interpreted by the U.S. Supreme Court in *Bryan v. Itasca Cty.*, 426 U.S. 373 (1976). Such acts violate the rights of the Nation and improperly alter the constitutional balance of federal, state and tribal authorities. It is unlawful for Defendants Hochul, James, and Dominguez to use New York's Laws as a means for expanding state regulatory jurisdiction on the Nation's federally-protected restricted fee lands.

144.     Defendants Hochul, James, and Dominguez's attempt to apply New York state law to activities on the Nation's restricted fee lands at Westwoods is preempted by federal law.

### COUNT II: INJUNCTION

145.     The Nation realleges and incorporates the allegations contained in the proceeding paragraphs 1-144 as specifically set forth herein.

146.    The Nation is entitled to an injunction to enforce federal law protecting its Westwoods property from continuing unauthorized use of Sunrise Highway without a valid right-of-way approved by the Secretary of the Interior.

147.    The continued operation of Sunrise Highway over and across the Nation's Westwoods property by Defendants Hochul, James, and Dominguez without a valid right-of-way violates federal law that comprehensively regulates rights-of-way across Indian lands such as Westwoods.  25 U.S.C. § 177; 25 U.S.C. § 323; 25 C.F.R. Part 169.

148.    The Nation is entitled to an injunction requiring that all Defendants (except for Justice Liccione) obtain a valid right-of-way for the portion of its Westwoods property on which Sunrise Highway is situated, so as to bring continued public use and benefit from the Nation's Westwoods property into compliance with federal law on terms that will in the future equitably compensate the Nation pro rara for the future use of Westwoods.

149.    The Nation is entitled to an injunction enjoining Defendant Liccione from taking further action in the courts of the New York State with respect to Westwoods and the Monument Signs. By issuing preliminary injunctive relief against the Nation's Trustees in the Supreme Court of the State of New York, Defendant Justice Liccione violated federal law protecting Indian lands from infringement by States, including her improper assertion of jurisdiction over the Nation's officials conducting official business of the Nation on the Nation's restricted fee lands. Defendant Liccione also violated and continues to violate the sovereignty of the Nation over its restricted fee lands at Westwoods by enforcing the preliminary injunction for which Defendant Liccione has no jurisdiction. In so doing, Defendant Liccione inflicted a grave injury against the Nation and its sovereignty. Federal law

precludes Defendant Justice Liccione from exercising jurisdiction over the Nation or its officials for the conduct of business on the Nation's restricted fee lands as part of an action purporting to assert civil regulatory jurisdiction on behalf of New York State over the Nation's restricted fee lands.

150. The Nation is suffering and will continue to suffer irreparable harm without injunctive relief because its Westwoods property will continue to be burdened by unauthorized illegal encroachment. The Nation lacks an adequate remedy at law, and therefore, an injunction is necessary to remedy the Nation's injuries.

151. The balance of equities favors the Nation, as the Defendants will not suffer any legally cognizable harm from an injunction enforcing federal law, while the Nation will suffer irreparable harm, in denial of rightful use, benefit of, and access to its federally protected lands in the absence of such an injunction.

152. An injunction is in the public interest because compliance with federal law governing the conveyance of rights-of-way over Indian lands is in the public interest.

## COUNT III: DECLARATORY JUDGMENT

153. The Nation realleges and incorporates the allegations contained in the proceeding paragraphs 1-152 as specifically set forth herein.

154. The Nation seeks and is entitled to a declaration that Defendants (except for Defendant Liccione) are violating federal law by not obtaining a valid right-of-way for the portion of the Sunrise Highway running over and across the Nation's Westwoods property.

155. The Nation seeks and is entitled to a declaration that Defendant Justice Liccione is violating federal law by ordering preliminary injunctive relief against the Nation's Trustees

relating to the Nation's use and development of its federally-protected Westwoods property in the Supreme Court of the State of New York, Suffolk County.

156.    The Nation seeks and is entitled to further necessary or property relief pursuant to such a declaration, as the Court may see fit.

## PRAYER FOR RELIEF

**WHEREFORE**, in accordance with the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, and general principles of equity, the Nation respectfully seeks:

A.  An injunction requiring that Defendants (except for Defendant Justice Liccione) obtain a valid right-of-way from the Secretary of the Interior for the portion of the Nation's Westwoods property on which Sunrise Highway is situated, so as to bring continued public use of, and public benefit from, those Indian lands in compliance with federal law on terms that will in the future equitably compensate the Nation pro rata for future use of the Westwoods property, including provisions to compensate the Nation for continued deprivation of access, use and benefit from lands within and near the easement;

B.  An injunction restraining all Defendants from taking further action in the courts of the New York State with respect to Westwoods and the Monument Signs and ordering them to enter into an agreement to stay further State Court litigation to preserve this Court's jurisdiction, preserve the *res* of this litigation, and to effectuate a resolution of issue fundamentally based in federal Indian law;

C.  B.  An injunction staying the action bearing caption *Commissioner of the New York State Department of Transportation et al. v. Lisa Goree et al.*, and Index No. 610010/2019;

D. A declaration that Defendants (except for Defendant Liccione) are violating federal law by not obtaining a valid right-of-way for the portion of Sunrise Highway that passes over and across the Nation's Westwoods property;

E. A declaration that Defendants (except for Defendant Liccione) are violating federal law by attempting to enforce New York Highway Law against sovereign economic activity of the Nation on its restricted fee land in Westwoods;

F. A declaration that Defendants (except for Defendant Liccione) exceeded the scope of their purported easement by excluding the Nation from developing on its restricted fee land and by other actions beyond the scope of the easement (include broadly focused surveillance cameras), even if that easement were valid;

G. A declaration that Defendant Liccione is violating federal law by ordering preliminary injunctive relief against the Nation's Trustees relating to the Nation's use and development of its federally-protected Westwoods property;

H. Such further necessary or proper relief as the Court may see fit to grant in conjunction with a declaratory judgment;

I. All costs and fees allowed by law; and

J. Such other and additional relief as the Court deems just and proper.

Respectfully Submitted,

Dated: January 13, 2026
Brooklyn, New York

BY:     */s/ Tela Troge*
       **Law Offices of Tela Troge, PLLC**
       Tela L. Troge

26 Hill Street # 124
Southampton, NY 11968
Telephone: (631) 745-6203
Email: telatroge@shinnecock.org

**DRAGONFLY LAW GROUP, P.C.**
JUDITH A. SHAPIRO
731 St. Joseph St., Suite 230
Rapid City, SD
Telephone: (202) 257-6436
Email: jshapiro@dflylaw.com

THOMAS J. NITCHKE
731 St. Joseph St., Suite 230
Rapid City, SD
Telephone: (605) 646-0189
Email: tomn@dflylaw.com

**BYRNES, O'HERN & HEUGLE LLC**
JOHN F. BYRNES
195 East Bergen Place
Red Bank, New Jersey 07701
Phone: (732) 219-7711

*Attorneys for Plaintiff Shinnecock Indian Nation*